914 F. Supp. 525

AD HOC COMMITTEE OF SOUTHERN CALIFORNIA PRODUCERS OF GRAY PORTLAND CEMENT, PLAINTIFF *v.* UNITED STATES, DEFENDANT, AND ONODA CEMENT CO., LTD., INTERVENORS

Consolidated Court No. 93–10–00697

(Dated December 1, 1995)

*King & Spalding (Joseph W. Dorn, Martin M. McNerny, Gregory C. Dorris,* and *Jill Greaney),* for plaintiff the Ad Hoc Committee of Southern California Producers of Gray Portland Cement.

*Frank W. Hunger*, Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice *(Hal S. Shapiro)*; Office of the Chief Counsel for Import Administration, United States Department of Commerce *(David J. Ross* and *Barbara Campbell Potter)*, of counsel, for defendant.

*Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Patrick F.J. Macrory, P.C* and *Spencer S. Griffith)* for intervenor Onoda Cement Co., Ltd.

## MEMORANDUM AND OPINION

GOLDBERG, *Judge:* This matter is before the Court on motions for judgment on the agency record made pursuant to USCIT Rule 56.2 by respondent, Onoda Cement Co., Ltd. ("Onoda"), and petitioner, the Ad Hoc Committee of Southern California Producers of Gray Portland Cement ("Committee"). In their motions, Onoda and the Committee challenge the final results of the first antidumping duty administrative review concerning gray portland cement and clinker from Japan, which the United States Department of Commerce, International Trade Administration ("Commerce") issued and amended in 1993. *Gray Portland Cement and Clinker From Japan,* 58 Fed. Reg. 48,826 (1993); *Gray Portland Cement and Clinker From Japan,* 58 Fed. Reg. 53,705 (1993) *("Final Results")*. The Court exercises its jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988).

## DISCUSSION

In deciding a motion for judgment on the agency record, the Court analyzes whether Commerce's determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is more than a mere scintilla. *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd,* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States,* 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984) (citing *Consolidated Edison Co. v. N.R.L.B.,* 305 U.S. 197, 229 (1938)).

In moving for judgment on the agency record, the parties raise a total of ten issues for the Court's review. Specifically, Onoda contests the following six aspects of Commerce's final results: (1) whether Commerce erred by comparing U.S. sales of type II cement with home market sales of type N cement; (2) whether Commerce erred by treating expenses related to Onoda's home market service stations as indirect expenses; (3) whether Commerce erred by treating the cost of transporting Onoda cement from U.S. ports to ready-mix plants as further manufacturing costs; (4) whether Commerce erred by failing to deduct from the sales revenue of Onoda's related importer, Lone Star Northwest ("Lone Star"), freight-out and inland insurance expenses incurred when Lone Star transported cement to unrelated customers; (5) whether Commerce erred in calculating terminal expenses for Onoda's sales of cement in Washington; and (6) whether Commerce erred by calculating duties on the basis of all sales, rather than all entries, made during the

period of review.[1] In addition, the Committee contests the following four aspects of Commerce's final results: (1) whether Commerce erred by granting a difference in merchandise adjustment to Onoda; (2) whether Commerce failed to treat pre-sale moving expenses in a manner consistent with *Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* ___ Fed. Cir. (T) ___, 13 F.3d 398 (1994); (3) whether Commerce failed to deduct from U.S. price all relevant freight expenses incurred when Lone Star shipped concrete to unrelated customers in the United States; and (4) whether Commerce erred in calculating the amount of home market service station expenses to include in cost of production. The Court will address each of these issues in turn.

## A. ONODA'S CHALLENGES

### 1. *Commerce's Comparison of U.S. Sales of Type II Cement with Home Market Sales of Type N Cement:*

Onoda claims that Commerce's decision to compare U.S. sales of type II cement with home market sales of type N cement in the underlying administrative review was neither supported by substantial evidence nor in accordance with law. Onoda asserts that Commerce initially declined to compare type II with type N because type N has a higher tricalcium aluminate level, and this makes it less resistant to sulfates than type II. Then, according to Onoda, Commerce inexplicably used type N as a comparison in reaching its final results, when it should have used constructed value instead. The Court finds that Onoda's argument lacks merit.

In determining whether a foreign manufacturer is selling merchandise at less than fair value in the United States, and to calculate a dumping margin, Commerce attempts to compare U.S. sales of the subject merchandise with sales of identical merchandise in the home market. *See* 19 U.S.C. § 1677b(a)(1)(A) (1988); *Hussey Copper, Ltd. v. U.S.,* 17 CIT 993, 995, 834 F. Supp. 413, 417 (1993). If identical home market merchandise is unavailable, Commerce attempts to compare U.S. sales of the subject merchandise with sales of the most similar home market merchandise. *Hussey Copper,* 17 CIT at 995, 834 F. Supp. at 417. If other categories of similar merchandise are not available, similar merchandise may consist of:

Merchandise—
(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
(ii) like that merchandise in the purposes for which used, and
(iii) which the administering authority determines may reasonably be compared with that merchandise.

---

[1] The Court notes that in Onoda's Rule 56.2 motion, Onoda originally raised one additional issue: whether Commerce erred by excluding from its foreign market value calculation home market sales to related distributors. However, Onoda subsequently amended its complaint to withdraw this issue. Consequently, the Court will not review the issue.

19 U.S.C. § 1677(16)(C) (1988). If Commerce cannot find any similar home market merchandise, then Commerce may resort to using constructed value in making its comparison. 19 U.S.C. § 1677b(a)(2) (1988).

In this case, Commerce could not compare U.S. sales of type II cement with identical home market merchandise because Onoda does not sell identical merchandise in the home market. Commerce therefore attempted to find the home market model that is most similar to type II. Commerce rejected the most physically similar home market cement, type M, because its variable cost of manufacture differs too much from that of type II.[2] Commerce consequently asked Onoda to provide it with information about other home market cements that could be compared with type II. Onoda recommended that:

> the Department *should use Type N as a basis for comparison to Type II*. Type N would be an appropriate second choice for comparison because it is closest in cost to Type II * * *. In addition to being the closest in cost, *Type N has many similar uses to Type II in general construction and civil engineering*.

Public Document ("Pub. Doc.") 42, Confidential Document ("Conf. Doc.") 13 (citation omitted) (emphasis added).

Upon first examination, Commerce found that it could not compare type N with type II because type N's higher tricalcium aluminate level makes it less resistant to sulfates than type II, and consequently, the two cements are not used for identical purposes. Pub. Doc. 52, Conf. Doc. 20. Before issuing its final results, however, Commerce reviewed the governing statute, 19 U.S.C. § 1677(16)(C) (1988), and realized that the statute requires similar products to have *like* purposes, and not identical purposes. *Final Results,* 58 Fed. Reg. 48,827. With this in mind, Commerce reconsidered its earlier decision regarding type N, and it determined that it could compare type N with type II pursuant to § 1677(16)(C).

Upon review, the Court finds that Commerce's ultimate decision to compare type N with type II is supported by substantial evidence and otherwise in accordance with law. First, none of the parties dispute that type II and type N are of the same class or kind, i.e. gray portland cement. Second, as Onoda pointed out when it recommended that Commerce use type N, type II and type N have like purposes when used in general construction and civil engineering projects. *Final Results,* 58 Fed. Reg. 48,827; Pub. Doc. 42, Conf. Doc. 13. Third, it is reasonable to compare type N with type II because the variable cost of manufacture difference between type N and type II is less than 20 percent of the total cost of manufacture of type II. *Final Results,* 58 Fed. Reg. 48,828, Pub. Doc. 52, Conf. Doc. 20. Accordingly, the Court affirms this aspect of the final results.

---

[2] Type M failed Commerce's twenty percent difference in merchandise test. Public Document 52, Confidential Document 20.

## 2. *Commerce's Treatment of Expenses Related to Onoda's Home Market Service Stations as Indirect Expenses*

Onoda claims that Commerce erred by classifying expenses related to certain Japanese service stations, in which Onoda temporarily stores cement, as warehousing expenses. Onoda further claims that Commerce erred by treating the home market service station expenses as indirect selling expenses. According to Onoda, Commerce should classify the expenses as movement expenses because the service stations serve as an integral part of Onoda's system of transporting cement to customers; Onoda uses the service stations in the process of transferring cement from water transportation to land transportation, and vica versa. Further, according to Onoda, Commerce should treat the home market service station expenses as direct selling expenses and make an adjustment to account for them in its comparison of foreign market value ("FMV") and U.S. price. The Court does not agree.

In calculating FMV, Commerce can make an allowance for differences in the circumstances of sale if it is satisfied that they caused any difference between U.S. price and FMV. 19 U.S.C. § 1677b(a)(4)(B) (1988).[3] The circumstances for which Commerce makes an allowance must generally "bear a *direct* relationship to the sales compared." 19 C.F.R. § 353.56(a)(1) (1993) (emphasis added). More specifically, the home market expenses for which Commerce makes an allowance must, as a general matter, be directly tied to specific sales or specific customers. *Hussey Copper,* 17 CIT at 1001, 834 F. Supp. at 421. If the expenses are not directly tied to specific sales, but are incurred to advance sales in general, then Commerce may treat them as indirect selling expenses. *Id.* In cases in which Commerce examines exporter's sales price, Commerce may deduct indirect expenses from FMV under the statutory provision for differences in the circumstances of sale, but only up to the level of indirect expenses incurred in the United States. 19 C.F.R. § 353.56(b)(2) (1993).

Upon review, the Court finds that Commerce's decision to classify Onoda's home market service station expenses as warehousing expenses, and to treat them as indirect selling expenses, is supported by substantial evidence and otherwise in accordance with law for several reasons. First, Onoda has not earmarked the cement held in the service stations for particular sales or particular customers; indeed, Onoda admits that the service stations temporarily store cement that is awaiting sale. *Final Results,* 58 Fed. Reg. 48,828. Second, Onoda failed to submit evidence showing that service stations differ from warehouses in

---

[3] 19 U.S.C. § 1677b(a)(4)(B) provides:

In determining [FMV], if it is established to the satisfaction of the administering authority that the amount of any difference between the [U.S.] Price and the [FMV] (or the fact that the [U.S.] Price is the same as the [FMV]) is wholly or partly due to —

\*          \*          \*          \*          \*          \*          \*

(B) other differences in circumstances of sale;

\*          \*          \*          \*          \*          \*          \*

then due allowance shall be made therefor.

their physical structure. *See Id.* Third, some repacking, a job that is traditionally done at warehouses, is done at the service stations. *Id.;* Pub. Doc. 107, Conf. Doc. 46. Fourth, Commerce found evidence to indicate that the service stations are not entirely necessary to transport cement to customers; some cement enters and leaves the service stations by the same means of transportation, and some cement is never stored at the service stations before it is delivered to customers. *Final Results,* 58 Fed. Reg. 48,828; Pub. Doc. 107, Conf. Doc. 46. Accordingly, the Court affirms this aspect of Commerce's final results.

3. *Commerce's Treatment of the Cost of Transporting Onoda Cement From U.S. Ports to Ready-Mix Plants as Further Manufacturing Costs:*

Onoda's related importer, Lone Star, receives Onoda cement at U.S. ports and further manufactures some of this cement into ready-mix concrete. Onoda argues that Commerce erred by treating the cost of transporting Onoda cement from U.S. ports to ready-mix plants as further costs of manufacture, and by deducting the costs from U.S. price. Onoda claims that the transportation costs do not meet statutory requirements for further costs of manufacture because they are not incurred directly as a result of manufacture or assembly performed on the cement. The Court does not agree.

When a foreign manufacturer ships merchandise to a related importer in America, Commerce will deduct from U.S. price increased value added to the merchandise by a process of manufacture or assembly performed after importation and before sale to an unrelated customer. 19 U.S.C. § 1677a(e)(3) (1988). Commerce determines how much to deduct as increased value "from the cost of material, fabrication, and *other expenses incurred in"* the "process of production or assembly performed on the merchandise" during the relevant time frame. 19 C.F.R. § 353.41(e)(3) (1993) (emphasis added).

In this case, the Court finds that substantial evidence supports Commerce's decision to deduct costs incurred moving cement from U.S. ports to ready-mix plants as increased value added to the merchandise. First, the transportation costs are necessarily incurred in a process of manufacture performed on the merchandise; Lone Star must move the cement from U.S. ports to ready-mix plants in order to process the cement into ready-mix concrete. Second, the transportation costs are incurred during the relevant time frame, i.e. after importation and before sale to an unrelated customer. Accordingly, the Court affirms this aspect of the final results.

4. *Commerce's Deduction from the Sales Revenue of Onoda's Related Importer, Lone Star, of Freight-Out and Inland Insurance Expenses Incurred When Lone Star Transported Cement to Unrelated Customers in the United States:*

Onoda's related importer, Lone Star, incurred freight-out and inland insurance expenses in transporting ready-mix concrete to unrelated

customers. Onoda asserts that Commerce erred by failing to deduct these expenses from Lone Star's sales revenue when it calculated the per-sale profit for value-added ready-mix sales. Onoda further asserts that Commerce's error artificially increased the margin on ready-mix sales. Commerce agrees that the Court should remand this issue so that Commerce can reexamine its treatment of freight-out and inland insurance expenses. While the Committee does not deny that Commerce erred in its calculation of these expenses, the Committee argues that Onoda should be estopped from raising this argument because it did not raise this issue in the appropriate manner during the underlying administrative review. According to the Committee, Onoda failed to exhaust its administrative remedies because it did not challenge Commerce's treatment of Lone Star's freight-out and inland insurance expenses after the issuance of the preliminary results. Instead, Onoda raised this issue as a ministerial error after the issuance of the final results.[4]

Exhaustion of administrative remedies is generally required before a litigant may raise a claim in a civil action. *Wieland Werke, AG v. United States,* 13 CIT 561, 567, 718 F. Supp. 50, 55 (1989). This is because "[a] reviewing Court usurps the agency's function when it sets aside a determination upon a ground not previously presented and deprives the agency of an opportunity to consider the matter, make its ruling, and state the reasons for its action." *Id.* (citations omitted).

When Onoda objected to Commerce's failure to deduct freight-out and inland insurance expenses from Lone Star's sales revenue as a ministerial error, Commerce issued a memorandum that addressed the issue. Pub. Doc. 132, Conf. Doc. 63. Hence, Commerce considered the matter, made its ruling, and stated reasons for its action. Although Onoda may not have exhausted its administrative remedies in the most appropriate manner, Onoda's actions did result in the exhaustion of administrative remedies in this case. Indeed, Commerce does not deny that it had the opportunity to examine this issue; instead, it asks for the opportunity to reexamine it. Upon review, the Court finds that Onoda may raise this issue and remands the issue for reexamination by Commerce.

### 5. *Commerce's Calculation of Terminal Expenses for Onoda's Sales of Cement in Washington:*

Onoda sold cement to an unrelated distributor in America. This distributor in turn leased an import terminal located in Washington from Onoda's related U.S. importer, Lone Star. As part of its rent, the distributor paid Lone Star a percentage of the profit that it made selling Onoda cement. Onoda claims that Commerce incorrectly calculated Lone

---

[4] The facts at hand raise a question as to whether Commerce waives the exhaustion issue by failing to raise it itself, or whether the Committee may raise the exhaustion issue instead of Commerce. However, because the Court finds that Onoda has exhausted its administrative remedies, it will not address this question. *Compare Cutler v. Hayes,* 818 F.2d 879, 891 (D.C. Cir. 1987) (finding that agency's failure to raise exhaustion issue, paired with futility of exhaustion, constitutes waiver of the issue despite the fact that intervenor-defendant has raised the issue) *with Power Plant Div., Brown & Root, Inc. v. Occupational Safety and Health Review Comm'n,* 673 F.2d 111, 112–14 (5th Cir. 1982) (finding that agency's failure to raise exhaustion issue does not constitute waiver of the issue).

Star's net Washington terminal expenses because Commerce failed to offset the expenses that Lone Star incurred running the Washington terminal by the percentage of profit that Lone Star received as rent from the unrelated distributor. The calculation of Lone Star's net terminal expenses is significant to Onoda because Commerce deducted net terminal expenses in its calculation of U.S. price.

Onoda's argument is based on a misunderstanding of how Commerce calculated Lone Star's net Washington terminal expenses. This misunderstanding may have been fostered by a typographical error in a memorandum issued by Commerce. In that memorandum, Commerce inadvertently wrote that it had found that Lone Star's net terminal expenses were $20,000 less than Onoda had indicated in a case brief that it had filed. Pub. Doc. 132; Conf. Doc. 63. In spite of the error, however, Commerce actually found that the net terminal expenses were the same amount that Onoda had indicated in its case brief. Indeed, Commerce had properly offset Lone Star's total Washington terminal expenses by the amount of profit that Lone Star received from the distributor. Consequently, the Court finds that Commerce's calculation of Lone Star's net Washington terminal expenses is supported by substantial evidence and otherwise in accordance with law. The Court therefore affirms this aspect of the final results.

6. *Commerce's Calculation of Duties on the Basis of All Sales, Rather Than All Entries, Made During the Period of Review:*

Onoda argues that Commerce erred by calculating duties on the basis of all sales, rather than all entries, made during the period of review. Onoda further argues that Commerce's error results in the following improper consequences: (1) the margin calculation includes sales of merchandise entered before the suspension of liquidation; (2) the margin calculation fails to include merchandise that was entered during the review period, but sold after the review period ended; and (3) the statutory "cap" which limits the rate of duty that may be assessed against entries made between the preliminary less than fair value determination and the publication of the International Trade Commission's ("ITC's") injury determination will be violated.[5] In response, Commerce argues that the Court has previously held that it is in accordance with law for Commerce to calculate a dumping margin based upon all sales made during the review period. In addition, Commerce asserts that during the underlying review, Onoda failed to raise the following two arguments: (1) the margin calculation includes sales of merchandise entered prior to suspension of liquidation; and (2) the statutory

---

[5] The statutory duty cap is set forth at 19 U.S.C. § 1673f(a) (1988). This section provides:

If the amount of cash deposit collected as security for an estimated antidumping duty under section 1673b(d)(2) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference for entries of merchandise entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission under section 1673d(b) of this title is published shall be —

(1) disregarded, to the extent the cash deposit collected is lower than the duty under the order, or

(2) refunded, to the extent the cash deposit is higher than the duty under the order.

duty cap will be violated. Therefore, according to Commerce, Onoda should be estopped from raising these arguments in this action. In its response, the Committee takes the estoppel argument a step further than Commerce. The Committee asserts that the only argument that Onoda raised during the underlying review was that the margin calculation should include merchandise that was entered during the period of review, but sold after the review period ended. According to the Committee, Onoda cannot raise any other arguments in this action because it failed to exhaust its administrative remedies.[6]

At the administrative level, Onoda argued "that the Department should include in its calculation of the antidumping margin sales that were made after the review period ended but for which the merchandise entered during the review period" because "the Department has the statutory authority to assess margins on entries rather than sales." *Final Results,* 58 Fed. Reg. 48,832. Although Onoda has embellished its argument in bringing it before the Court, it did raise the issue sufficiently to let Commerce consider the matter, make its ruling, and state the reason for its ruling. *Wieland Werke,* 13 CIT at 567, 718 F. Supp. at 55. This is illustrated by the fact that Commerce responded to Onoda's argument at length in the final results.[7] Consequently, the Court finds that Onoda has exhausted its administrative remedies sufficiently for the Court to review the issue of whether Commerce erred by calculating duties on the basis of all sales, rather than entries, made during the period of review. In reviewing this issue, the Court will address the allegedly improper consequences that Onoda claims will result from Commerce's chosen methodology.

In *NSK Ltd. v. United States,* 17 CIT 590, 594–95, 825 F. Supp. 315, 320 (1993), this Court analyzed whether Commerce's calculation of a dumping margin based upon all sales, rather than entries, made during the review period was reasonable and in accordance with law. More specifically, the Court examined the statute governing margin calculation, 19 U.S.C. § 1675(a)(2) (1988).[8] *NSK,* 17 CIT at 594–95, 825 F. Supp. at 320. The Court then noted that in cases involving exporter's sales price, Commerce had cited the following five factors in support of its decision

---

[6] See note 4 *supra.*

[7] Commerce responded to Onoda's argument by stating:

> Our preferred methodology in reviewing ESP transactions is to review sales, rather than entries, due to the lag between entry dates and sales dates that typically is endemic to ESP transactions. If we were to set the parameters of ESP reviews based on entry dates, we would be precluded from completing our reviews in a timely manner because the review would have to be conducted after all relevant sales were made. While Onoda may have the relevant sales data available in conjunction with the entries during the period of review, unless Onoda could provide such data consistently from review to review, the potential for missed sales or the double counting of sales exists. Thus, in these final results of review, as in the preliminary results of review, we have reviewed all sales made during the review period, rather than all shipments entered during the review period * * *. Any sales made pursuant to entries in this review period which occurred after the close of the period will be reviewed in the next administrative review.

*Final Results,* 58 Fed. Reg. 48,832.

[8] 19 U.S.C. § 1675(a)(2) (1988) requires Commerce to determine:

> (A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and
> (B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

to calculate the dumping margin based upon all sales, rather than entries, made during the review period:

> (1) there is usually a lag time between entry and sale, (2) the entry data is often unavailable during the review, (3) a dumping margin cannot be determined without a sale, (4) dumping on sales made during the review period is representative of dumping on entries made during the review period, and (5) review of sales, which can cover many entries of merchandise, can eliminate the necessity of conducting multiple reviews of the same sales information because a sale can cover entries made during several review periods.

*Id.* at 595. The Court concluded that it was in accordance with law and reasonable for Commerce to calculate the dumping margin based upon all sales made during the period of review, so long as dumping duties were *assessed* only upon those entries made during the period of review. *Id.*

In this case, the Court also finds that Commerce's decision to use all sales, rather than entries, made during the period of review to calculate the dumping margin is reasonable and in accordance with law. *NSK* established that in cases in which Commerce examines exporter's sales price, Commerce may generally calculate a dumping margin based upon all sales made during the period of review. The fact that Onoda can provide information that would allow Commerce to base its margin on entries made during the period of review at issue does not render Commerce's chosen methodology unreasonable. *See GMN Georg Muller Nurnberg AG v. United States,* 17 CIT 266, 268 (1993) ("As long as Commerce's 'decision is reasonable, then Commerce has acted within its authority even if another alternative is more reasonable.'" (citation omitted)). This is particularly true because Commerce cannot rely on Onoda to provide it with similar information for future review periods. *See Final Results,* 58 Fed. Reg. 48,832. If Onoda fails to provide Commerce with necessary information in a timely manner for any future review, then Commerce may be compelled to look at all sales made during the period of review. *Id.* As a result, Commerce may end up examining the same sales to determine the dumping margins for two different periods of review. *See Id.*

The Court acknowledges that consideration of all sales, rather than entries, made during the period of review may result in the consideration of entries made prior to the suspension of liquidation, and the temporary failure to consider entries made, but not sold, during the period of review. However, such consequences are permissible so long as dumping duties are assessed only upon entries made during the period of review. *See NSK Ltd.,* 17 CIT 590, 595, 825 F. Supp. 315, 320 (discussing consideration in margin calculation of entries not subject to antidumping orders). Further, consideration of all sales made during the period of review will not necessarily result in the violation of the statutory duty cap applicable to entries made between the preliminary less than fair value determination and the publication of the ITC's injury determina-

tion. Indeed, Commerce has acknowledged that it will instruct Customs to liquidate the relevant entries at a rate no higher than the cap, in accordance with 19 U.S.C. § 1673f(a) (1988). *See* note 5 *supra*. Accordingly, the Court affirms this aspect of Commerce's final results.

### B. THE COMMITTEE'S CHALLENGES

### 1. *Commerce's Grant of a Difference in Merchandise Adjustment to Onoda:*

Commerce compared two U.S. models of Onoda cement, type I and type II, with a similar, but not identical, home market model known as "type N." *Final Results,* 58 Fed. Reg. 48,827; see part A1 *supra* (discussing Commerce's comparison of type II and type N). Because Onoda manufactured type N at several facilities, Commerce requested that Onoda provide it with the weighted average cost of manufacturing type N at all of its facilities. Upon analyzing the information submitted by Onoda, Commerce found that a cost difference between the U.S. models and type N was due to the fact that the models compared possessed similar, rather than identical, physical characteristics. Consequently, Commerce made an adjustment to account for the differences between the U.S. models and the similar, but not identical, home market model. In its motion for judgment on the agency record, the Committee argues that Commerce erred in making this adjustment because the cost difference between the U.S. models and type N resulted from inefficiencies at some of the facilities that produced type N, and not from differences in the physical characteristics of the cements. The Court does not agree.

In calculating FMV, Commerce will make an adjustment if it is satisfied that the amount of any difference between U.S. price and FMV is due to the fact that Commerce has compared home market merchandise that is similar, but not identical, to merchandise sold in the United States. 19 U.S.C. § 1677b(a)(4)(C) (1988). More specifically, Commerce will make a reasonable allowance if it is satisfied that any price differential resulted from differences in the physical characteristics of the merchandise compared. 19 C.F.R. § 353.57(a) (1993); *compare Certain Hot-Rolled Lead and Bismuth Carbon Steel Products From the United Kingdom,* 58 Fed. Reg. 6207, 6209 (1993) (final determination) (finding that a difference in merchandise adjustment was inappropriate where a substantial portion of cost differences were caused not by physical differences, but by differences in timing and plant efficiencies).

Upon review, the Court finds that Commerce's determination that price differences between U.S. and home market models were caused by differences in the physical characteristics of the merchandise compared, and Commerce's concomitant decision to grant a difference in merchandise adjustment to Onoda, are supported by substantial evidence and otherwise in accordance with law. First, evidence submitted by Onoda shows that U.S. models contain different materials than type N. Pub. Doc. 71; Conf. Doc. 28. In addition, evidence submitted by Onoda shows that U.S. models are produced in a different manner, i.e. with a different

amount and duration of heat than type N, and that this causes differences in the chemical and physical composition of the cements. Pub. Doc. 71; Conf. Doc. 28. Further, the Court notes that in Commerce's less than fair value investigation, Commerce verified that Onoda was entitled to a difference in merchandise adjustment. *Final Results,* 58 Fed. Reg. 48,827. Accordingly, the Court affirms this aspect of the final results.

2. *Commerce's Treatment of Pre-Sale Moving Expenses in Light of Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement:*

Commerce acknowledges that this case should be remanded so that it may treat pre-sale home market moving expenses in a manner consistent with *Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* ____ Fed. Cir. (T) ____, 13 F.3d 398 (1994) (*"Ad Hoc"*), a decision issued after the final results. In its motion for judgment on the agency record, the Committee agrees that the case should be remanded in light of *Ad Hoc*. However, the Committee also asserts that *Ad Hoc* prohibits Commerce from deducting any pre-sale moving expenses from FMV on remand. Onoda, on the other hand, asserts that *Ad Hoc* does not require that this case be remanded at all.

Upon review, the Court finds that this case should be remanded for reconsideration by Commerce in light of *Ad Hoc*, but it does not find that *Ad Hoc* prohibits Commerce from deducting pre-sale moving expenses from FMV. In *Ad Hoc,* the Federal Circuit held that Commerce lacks the *inherent* authority to deduct pre-sale home market transportation expenses in its calculation of FMV simply because the same expenses are eliminated from the U.S. price side of the equation. However, this Court has subsequently noted that Commerce may deduct such expenses in an appropriate case pursuant to the statutory provision that accounts for differences in the circumstances of sale, 19 U.S.C. § 1677b(a)(4)(B) (1988).[9] *Ad Hoc Committee of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States,* 18 CIT 906, 909–10, 865 F. Supp. 857, 861–62 (1994) (*"Ad Hoc II"*); *accord Torrington Co. v. United States,* Nos. 95–1134 and 95–1135 (Fed. Cir. Oct. 24, 1995). More specifically, in *Ad Hoc II* the Court explained that where Commerce conducts purchase price comparisons, Commerce may deduct pre-sale transportation costs from FMV if they constitute direct expenses. *Ad Hoc II,* 18 CIT at 910, 865 F. Supp. at 861–62. Where Commerce conducts exporter sales price comparisons, it may deduct indirect expenses, such as most pre-sale transportation costs, from FMV up to the level of indirect expenses incurred in the United States. *Id.* Accordingly, the Court remands this issue so that Commerce can determine the extent to which pre-sale home market transportation costs may be deducted from FMV in light of the *Ad Hoc* decision.

---

[9] See note 3 *supra* for text of 19 U.S.C. § 1677b(a)(4)(B).

3. *Commerce's Deduction From U.S. Price of All Relevant Freight Expenses Incurred When Lone Star Shipped Concrete to Unrelated Customers in the United States:*

The Committee and Commerce agree that Commerce erred in its application of 19 U.S.C. § 1677a(d)(2)(A) (1988). This statutory provision generally allows Commerce to reduce U.S. price by the amount, if any, attributable to additional costs incident to bringing merchandise from the place of shipment in the foreign country to the place of delivery in the United States. *Id.* Specifically, the Committee and Commerce agree that Commerce failed to deduct from U.S. price all of the relevant freight expenses incurred when Onoda's related importer, Lone Star, shipped concrete made with Onoda cement to unrelated customers in the United States. The Committee and Commerce request that the Court remand this case so that Commerce may correct its error, and Onoda does not oppose their request for remand. Upon review, the Court remands this issue to Commerce so that Commerce may calculate the correct deduction for relevant freight expenses incurred when Lone Star shipped Onoda concrete to unrelated customers in the United States.

4. *Commerce's Calculation of the Amount of Home Market Service Station Expenses to Include in Cost of Production:*

In calculating FMV, Commerce must disregard certain home market sales made below the cost of production. 19 U.S.C. § 1677b(b) (1988). In calculating cost of production ("COP"), Commerce includes, among other things, indirect selling expenses. In the underlying administrative review, Commerce determined that home market service station expenses were indirect selling expenses that should be included in COP. See part A3 *supra*. Consequently, Commerce attempted to ascertain the per-unit amount of service station expenses to include in COP.

For other indirect expenses, Commerce determined the per-unit amount to include in COP based upon information from two periods: (1) April 1990 through March 1991; and (2) April 1991 through March 1992. Pub. Doc. 132, Conf. Doc. 63. Commerce could not calculate the per-unit amount of service station expenses to include in COP using information from these two periods because Onoda only provided Commerce with service station expense data for the period from October 31, 1990 to April 30, 1992. Pub. Doc. 132, Conf. Doc. 63. Consequently, Commerce chose to calculate the per-unit amount of service station expenses to include in COP in the following manner: (1) it took the ratio of service station expenses to gross value of home market sales for the period from October 31, 1990 to April 30, 1992; and (2) multiplied this ratio by the cost of manufacture for each of the two COP periods, from April 1990 through March 1991 and from April 1991 through March 1992. Pub. Doc. 132; Conf. Doc. 63.

The Committee asserts that Commerce erred in calculating the per-unit amount of home market service stations to include in COP. Accord-

ing to the Committee, Commerce should have calculated the per-unit amount of service station expenses to include in COP by dividing service station expenses by quantity of gray portland cement. In response, Commerce admits that it erred in calculating the amount of service station costs to include in COP, and it asks the Court to remand the issue. Commerce does not, however, intend to calculate the amount of service station expenses to include in COP in the manner suggested by the Committee. Rather, Commerce would like to reopen the record to obtain information that would allow it to calculate the per-unit amount of service station costs to include in COP in the same manner as it did for other indirect expenses. Onoda, on the other hand, claims that the methodology that Commerce used to calculate the per-unit amount of service station expenses to include in COP in the underlying review was reasonable and should be upheld.

Upon review, the Court finds that Commerce erred in calculating the per-unit amount of service station expenses to be included in COP in the underlying review. It was inappropriate for Commerce to use the ratio of service station expenses to gross value in its calculation because service station expenses bear no relationship to gross value of home market sales. The Court does not, however, find that Commerce must calculate the amount of service station expenses to be included in COP in the manner suggested by the Committee. Commerce has selected a reasonable methodology for recalculating the per-unit amount of service station expenses to be included in COP. Because Commerce has selected a reasonable methodology, the Court will not reject it. *GMN Georg Muller Nurnberg AG v. United States,* 17 CIT 266, 268 (1993). Accordingly, the Court remands this issue so that Commerce may do the following: (1) reopen the record to obtain service station expense data for the periods from April 1990 through March 1991 and from April 1991 through March 1992; and (2) recalculate the per-unit amount of service station expenses to be included in COP using the same methodology as it did for other indirect expenses.

### CONCLUSION

In sum, the Court finds that the following aspects of Commerce's final results are supported by substantial evidence and otherwise in accordance with law: (1) Commerce's decision to compare U.S. sales of type II cement with home market sales of type N cement; (2) Commerce's determination that expenses related to Onoda's home market service stations are indirect expenses; (3) Commerce's determination that costs incurred transporting Onoda cement from U.S. ports to ready-mix plants are further manufacturing costs; (4) Commerce's calculation of terminal expenses for Onoda's sales of cement in Washington; (5) Commerce's decision to calculate duties on the basis of sales, rather than entries, made during the period of review; and (6) Commerce's decision to grant a difference in merchandise adjustment to Onoda. Accordingly, these aspects of Commerce's final results are affirmed.

However, the Court also finds that the following aspects of Commerce's final results are not supported by substantial evidence on the record or otherwise in accordance with law: (1) Commerce's failure to deduct from Lone Star's sales revenue freight-out and inland insurance expenses incurred when Lone Star transported cement to unrelated customers; (2) Commerce's treatment of pre-sale moving expenses; (3) Commerce's failure to deduct from U.S. price all relevant freight expenses incurred when Lone Star shipped concrete to unrelated customers in the United States; and (4) Commerce's calculation of the amount of home market service station expenses to include in cost of production. Consequently, these aspects of Commerce's final results are remanded for reconsideration consistent with this opinion. The Court shall enter its order accordingly.