Slip Op. 99 - 34

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| AMERICAN SILICON TECHNOLOGIES, ELKEM METALS COMPANY, GLOBE METALLURGICAL, INC., and SKW METALS & ALLOYS, INC., | : : : : | **PUBLIC VERSION** |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Before:  MUSGRAVE, JUDGE** |
| | : | Consol. Court No. 97-02-00267 |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| COMPANHIA BRASILEIRA CARBURETO DE CALCIO, COMPANHIA FERROLIGAS MINAS GERAIS-MINASLIGAS, and RIMA INDUSTRIAL, S/A, | : : : : : | |
| | : | |
| Defendant-Intervenors. | : | |
| | : | |

[Plaintiffs and defendant-intervenors move for judgment upon the agency record challenging the final results of the 1994-95 administrative review on silicon metal from Brazil. **Held**: The Court remands the final results with respect to:  (1) Minasligas' claimed depreciation; (2) CBCC's interest expenses; (3) CBCC's depreciation expenses; (4) Rima's deferred expenses; (5) Eletrosilex's financial expenses; (6) CBCC's and Rima's cost of  internally-produced charcoal; (7)  CBCC's supervisory labor costs; (8) CBCC's IPI taxes; (9) Rima's and CBCC's profit ratios; (10) Minasligas' interest income expense; and (11) Minasligas' profit calculation.  The Court affirms the final results as to all other issues.]

Dated:  April 9, 1999

*Baker & Botts, L.L.P. (William D. Kramer, Martin Schaefermeier, Clifford E. Stevens, Jr., and Courtney Eden)* for plaintiffs.

*David W. Ogden*, Acting Assistant Attorney General; *David M. Cohen*, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (*Randi Rimerman Serota*); of counsel: *Dave Mason*, Attorney Advisor, Office of Chief Counsel, Import Administration, U.S. Department of Commerce for defendant.

*Dorsey & Whitney, L.L.P. (Munford Page Hall, III and Philippe M. Bruno)* for defendant-intervenors.

**OPINION**

Plaintiffs, also petitioners in this review, American Silicon Technologies, Elkem Metals Company, Globe Metallurgical, Inc., and SKW Metals & Alloys, Inc. (collectively "American Silicon") and defendant-intervenors, respondents in this review, Companhia Brasileira Carbureto de Calcio, Companhia Ferroligas Minas Gerais-Minasligas, and Rima Industrial S/A (collectively "Minasligas") move for judgment upon the agency record challenging the final results of the 1994-95 administrative review on silicon metal from Brazil. *See Silicon Metal From Brazil; Final Results of Antidumping Duty Administrative Review and Determination Not To Revoke in Part*, 62 Fed. Reg. 1,970 (1997) ("*Final Results*"). In response to plaintiffs' motion, defendant, the U.S. Department of Commerce ("Commerce" or "the Department"), agrees to a remand on all issues except for plaintiffs' allegations that Commerce: (1) improperly calculated dumping margins by relying upon sales made during the period of review ("POR") rather than entries; (2) improperly relied upon accelerated depreciation for Minasligas' cost of production ("COP") and constructed value ("CV"); and (3) improperly relied upon a second-tier parent corporation's consolidated financial statements for the calculation of financial expenses.

In response to defendant-intervenors' motion, Commerce agrees to a remand on all issues. Plaintiffs, however, challenge the proposed remand of defendant-intervenors' issues. Plaintiffs argue

that Minasligas failed to substantiate its proposed remand issues during the administrative proceedings and should not now be allowed a "second bite at the apple."

## I.    Background

On August 18, 1997, the Court entered an order remanding this case to Commerce for the correction of ministerial errors identified by the parties. Commerce published amended final results correcting certain ministerial errors on October 17, 1997. Subsequently, on November 5, 1997, plaintiffs and respondent Eletrosilex submitted ministerial error comments with respect to the amended final results. Commerce then issued a redetermination on remand correcting additional ministerial errors on December 15, 1997.

## II.    Standard of Review

Section 516A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1) (1995), sets forth the standard of review for antidumping duty administrative reviews. Section 1516a(b)(1) states that "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ." 19 U.S.C. § 1516a(b)(1) (1995). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 405, 636 F. Supp. 961, 966 (1986), *aff'd*, *Ceramica Regiomontana, S.A. v. United States*, 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987).

## III.    Discussion

### A.    Commerce's Reliance Upon Sales Made During the Period of Review

Plaintiffs' first argue that both the plain language and legislative history of 19 U.S.C. §

1675(a)(2)(A) require "the Department to determine the margin of dumping of *each entry* of the subject merchandise during the POR."[1]  Br. in Supp. of Pls.' Mot. for J. Upon the Agency R. at 9 ("Pls.' Br.") (emphasis original).  Commerce, however, contends that the statute only requires that dumping margins be *assessed* upon all merchandise entered during the POR and that the "statute is silent . . . with respect to *how to calculate* the duties to be assessed."  Def.'s Mem. in Partial Opp'n to Pls.' and Def.-Intervenors' Motions for J. Upon the Agency R. at 11 ("Def.'s Br.") (emphasis original).  Commerce also argues that the court's approval of a sales-based approach for exporter's sales price, now constructed export price ("CEP"), margin calculations establishes that a sales-based approach is also permissible for export price ("EP") transactions.[2]  *Id.* at 12.

---

[1]  19 U.S.C. § 1675(a)(2)(A) provides that antidumping duties shall be based upon:

> (i) the normal value and export price . . . of *each entry* of the subject merchandise . . . , and
>
> (ii) the dumping margin for *each such entry.*

19 U.S.C. § 1675(a)(2)(A) (1995) (emphasis added).  The legislative history to § 1675(a)(2)(A) provides that:

> the results of the review would include a determination of the foreign market value and the U.S. price of *each entry* of merchandise subject to that order and included within the review, and the amount, if any, by which the foreign market value of *each entry* exceeds the U.S. price of the entry.

S. REP. NO. 96-249, at 79 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 466 (emphasis added).

[2]  "Prior to the Uruguay Round Agreements Act, export price ("EP") sales were designated purchase price sales, while constructed export price sales ("CEP") were designated exporter's sales price.  'Notwithstanding the change in terminology, no change [was] intended in the circumstances under which export price versus constructed export price are to be used.'" *Helmerich & Payne, Inc.*

(continued...)

When read in isolation, both § 1675(a)(2)(A) and its legislative history seem to require that

Commerce calculate dumping margins based solely upon entries made during the POR. However,

in performing its statutory analysis, this Court must also recognize that:

> 'a section of a statute should not be read in isolation from the context
> of the whole Act, and in fulfilling [its] responsibility in interpreting
> legislation, [the court] must not be guided by a single sentence or
> member of a sentence, but [should] look to the provisions of the
> whole law, and to its object and policy.'

*Marcel Watch Co. v. United States*, 16 CIT 474, 477, 795 F. Supp. 1199, 1202 (1992) (quoting

*Algoma Tube Corp. v. United States*, 9 CIT 418, 422 (1985)); *see also Philbrook v. Glodgett*, 421

U.S. 707, 713 (1975) ("'In expounding a statute, we must not be guided by a single sentence or

member of a sentence, but look to the provisions of the whole law, and to its object and policy.'")

(quoting *United States v. Heirs of Boisdore*, 8 How. 113, 122 (1849)). And once § 1675(a)(2)(A)

is read in the context of the antidumping law as a whole, the Court finds that Congress could not

have intended to limit Commerce's margin calculations solely to entries.

As defendant correctly points out, the court has approved Commerce's use of sales during

the POR rather than entries during the POR when calculating § 1675(a)(2)(A) antidumping margins.

*See Ad Hoc Committee of Southern California Producers of Gray Portland Cement v. United States*,

19 CIT 1398, 1406-08, 914 F. Supp. 535, 544-45 (1995) ("*Portland Cement*"); *NSK Ltd. v. United*

*States*, 17 CIT 590, 595, 825 F. Supp. 315, 320 (1993) ("*NSK Ltd.*"). In *NSK Ltd.*, the court held that

"although Commerce looks at sales to calculate dumping margins, dumping duties were assessed

---

[2](...continued)
*v. United States*, __ CIT__, 24 F. Supp. 2d 304, 308 n.2 (1998) (quoting H.R. REP. NO. 103-826(I),
at 79 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3851).

only upon the entries made during the period of review. Thus, Commerce's methodology for calculating dumping duties in this case is reasonable . . . ." *NSK Ltd.,* 17 CIT at 595. The court in *Portland Cement*, relying upon the holding in *NSK Ltd.*, held that when Commerce examines exporter's sales price, now CEP, the Department "may generally calculate a dumping margin based upon all sales made during the period of review." *Portland Cement,* 19 CIT at 1407. The *Portland Cement* Court also held that dumping duties calculated under a sales-based approach must only be assessed upon entries made during the POR. *Id.*

But as plaintiffs point out, both *Portland Cement* and *NSK Ltd.* involved exporter's sales price, now CEP, transactions, not EP transactions such as those currently before this Court. Plaintiffs contend that the court's approval of a sales-based approach in *Portland Cement* and *NSK Ltd.* was based upon the recognition that "[t]here are fundamental differences between cases involving CEP transactions and those involving EP transactions." Reply Br. in Supp. of Pls.' Mot. for J. Upon the Agency R. at 7 ("Pls.' Reply Br."). Plaintiffs also note that "in CEP cases the entry data often are unavailable during the review, rendering it impossible to tie entries to sales." *Id.* With regard to EP transactions, plaintiffs contend that Commerce is generally able to tie entries to sales. Therefore, plaintiffs argue, the justification used by the court to support a sales-based approach for CEP transactions does not exist in EP reviews.

The problem with plaintiffs' argument is that if the Court were to require an entries-based methodology based upon the "plain language" of § 1675(a)(2)(A), Commerce would subsequently be required to utilize an entries-based approach not only for EP transactions, but also CEP transactions. Under a plain language reading of § 1675(a)(2)(A), the term "entry" appears to apply

equally and without distinction to both CEP and EP transactions.  Any ruling by this Court as to the meaning of the term "entry," as set forth in § 1675(a)(2)(A), would, therefore, also apply equally and without distinction to both CEP and EP margin calculations.[3]

The parties agree that it is oftentimes impossible for Commerce to tie sales to entries for CEP transactions.  If Commerce were required to limit its § 1675(a)(2)(A) margin analysis solely to entries made during the POR, Commerce would then be presented with two options, either attempt to perform the impossible or cease calculating dumping margins for CEP transactions.  Either result would significantly impede Commerce's ability to effectively enforce the antidumping law and could not have been intended by Congress.  Therefore, the Court finds that once § 1675(a)(2)(A) is read in the context of the antidumping law as a whole, it becomes apparent that Commerce is not limited to entries made during the period of review when calculating dumping margins.

The Court next turns to plaintiffs' argument that even if a sales-based approach is authorized, Commerce improperly deviated from its established practice of tying sales to entries when calculating margins for EP transactions.  The parties agree that it is Commerce's established practice to calculate dumping margins based upon entries made during the POR.  The parties also agree that in the administrative review at issue, Commerce departed from this established practice when it relied upon sales made during the POR.  What the parties do not agree upon is the validity of Commerce's departure from established practice.

---

[3] The "'need for uniformity becomes more imperative where the same word or term is used in different statutory sections that are similar in purpose and content . . . .'"  SUTHERLAND STAT. CONST. § 51.02, at 122 (5th Ed) (quoting *Commissioner of Internal Revenue v. Estate of Ridgway*, 291 F.2d 257 (3rd Cir. 1961)).

"It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure . . . .'" *Hussey Cooper, Ltd. v. United States*, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993) (quoting *Citrusuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F. Supp. 1075, 1088 (1988)). Commerce is required to explain the reason for its departure to allow the court to "'understand the basis of the agency's action and . . . judge the consistency of that action with the agency's mandate.'" *Crescent Foundry Co. Pvt. Ltd. v. United States,* __ CIT __, __, 951 F. Supp. 252, 261 (1996) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973)). But "[w]hen the Court finds that an agency has departed from past practice without an adequate explanation for the basis of the departure, the agency's determination must be rejected." *American Silicon Technologies v. United States,* __ CIT __, __, 19 F. Supp. 2d 1121, 1123 (1998).

Commerce agrees that it "normally bases the margin calculation for export price ("EP") sales upon those sales that *entered* the United States during the POR." Def.'s Br. at 13 (emphasis added). Commerce contends, however, that "nothing in the statute or regulations requires this approach, and Commerce retains the discretion to diverge from its normal practice where warranted." *Id.*

Commerce then argues that in this case deviation from established practice was necessary to maintain consistency throughout all administrative reviews of silicon metal from Brazil. "Commerce has found that the use of a sales-based approach may be warranted for EP sales where necessary to achieve consistency with prior reviews." *Id.*

> [B]y applying a consistent methodology in each segment of the proceeding we ensure that we review all sales made during the entire proceeding. Changing the methodology could result in our failure to review some sales. Hence, in these final results of review we have

> employed the methodology we announced in the final results of the
> second review.

*Id.* at 17 (quoting *Silicon Metal From Brazil; Final Results of Antidumping Duty Administrative*

*Review and Determination Not To Revoke in Part*, 62 Fed. Reg. 1,970, 1,972 (1997)).  In addition,

Commerce contends that:

> to change the methodology for one administrative review . . . would
> result in the exclusion of some sales of subject merchandise and
> double counting of others in the calculations of dumping margins
> over the course of the administrative reviews of silicon metal from
> Brazil.  Such a result is contrary to Congress' mandate that dumping
> margins be as accurate as possible.

*Id.* at 19.

In reply, plaintiffs challenge Commerce's consistency argument on three grounds.  First, "the

Government does not identify a single respect in which the underlying facts of this case . . . are any

different than those in the universe of cases where the Department has applied its established entry-

based methodology."  Pls.' Reply Br. at 11.  Second, "over the course of this proceeding, the

Department has not even consistently followed the distortive sales-based methodology that it

advocates."  *Id.*  And third, Commerce's sales-based approach was distortive from its inception and

does not result in a more accurate measure of dumping margins than an entry-based approach.  *Id.*

In the final results of first administrative review of silicon metal from Brazil, Commerce

applied a sales-based approach to its EP dumping margin analysis.  Commerce reasoned that a

departure from the established practice of an entry-based approach was necessary because:

> (1) the selling price and each of the expenses associated with this sale
> were known by Eletrosilex and reported to the Department at an early
> stage of the review process, and

> (2) use of this sale in our margin calculations constitutes the most accurate reflection of Eletrosilex's pricing practices during the period of review.

Def.'s Br. at 15-16 (quoting *Silicon Metal from Brazil; Final Results of Antidumping Duty Administrative Review*, 59 Fed. Reg. 42,806, 42,813 (1994)).  Commerce's goal of obtaining the most accurate dumping margins possible is an adequate justification for departing from established practice, especially in light of the court's holding that "fair and accurate determinations are fundamental to the proper administration of our dumping laws."  *Koyo Seiko Co., Ltd. v. United States*, 14 CIT 680, 682, 746 F. Supp. 1108, 1110 (1990).  And once it has been established that the original departure was reasonable, it would also seem reasonable for Commerce to apply this methodological exception to subsequent administrative reviews for the purpose of "applying a consistent methodology in each segment of the proceeding" to ensure that all sales made during the entire proceeding are reviewed.  Def.'s Br. at 17 (quoting *Silicon Metal From Brazil; Final Results of Antidumping Duty Administrative Review and Determination Not to Revoke in Part*, 62 Fed. Reg. 1,970, 1,972 (1997)).  The Court, therefore, sustains Commerce's interpretation of § 1675(a)(2)(A) and subsequent reliance upon a sales-based methodology for EP margin calculations.

## B.    Commerce's Acceptance of Minasligas' Claimed Depreciation

Plaintiffs next argue that Commerce "grossly understated" the monthly amounts of depreciation reported by Minasligas as part of fixed factory overhead because Minasligas reported accelerated depreciation data which was neither:  (1) in accordance with Brazilian generally accepted accounting principles ("GAAP"); nor (2) reasonably reflective of actual costs as required by statute.

Pls.' Br. at 17, 24.[4]  Plaintiffs contend that Minasligas should have depreciated the equipment at issue over a useful life of twenty years rather than the reported depreciation of five years.  The effect of a five-year depreciation rate in this case is that no depreciation expenses were included in Commerce's reported fixed factory overhead analysis because the equipment was acquired more than five years before the POR.

In response, Commerce contends that it was reasonable for the Department to rely upon Minasligas' depreciation methodology because that methodology was found to be consistent with Brazilian GAAP.  Commerce argues that:

> pursuant to Brazilian GAAP, companies may maintain accounting records and prepare financial statements using the depreciable asset lives suggested by Brazilian tax regulations, as long as the tax-based depreciable lives do not materially distort the results of the company's operations, *i.e.*, the net book value of assets as reported in the company's balance sheet or the depreciation expense as reported in its income statement for the fiscal year.

Def.'s Br. at 31.

While it is true that the court has sustained Commerce's use of accounting methodologies found to be consistent with a home country's GAAP, the court has also held that Commerce must reject GAAP consistent methodologies when they are distortive and do not reflect actual costs.  *Thai Pineapple Pub. Co., Ltd. v. United States*, __ CIT __, __, 946 F. Supp. 11, 20 (1996).  Upon review of the facts in this case, the Court agrees that even if Minasligas' accelerated depreciation

---

[4]  In performing its depreciation calculations, Minasligas first relied upon a Brazilian tax regulation which provides that the annual rate of depreciation for an asset may be based upon one half the useful life admitted for the asset acquired as new.  Pls.' Br. at 22.  Minasligas then applied a second regulation which authorizes further depreciation for assets used in more than one eight hour shift.  *Id*.

methodology is consistent with Brazilian GAAP, that methodology is also "grossly distortive

because it shifts to years prior to the POR almost all of the depreciation attributable to the production

of silicon metal during the POR." Pls.' Br. at 25. The Court also agrees that as a result of the

accelerated depreciation:

> Minasligas has benefitted and continues to benefit from the use of its
> principal silicon metal production assets long after the initial five-
> year period during which Minasligas recorded depreciation based on
> highly accelerated depreciation rates in its accounting records. This
> shifting of costs through the use of highly accelerated depreciation
> violates the fundamental accounting principle, routinely recognized
> by the Department, that costs must be properly matched with
> revenues.

*Id.* at 25-26. Therefore, the Court finds that Commerce's use of Minasligas' accelerated depreciation

rates was contrary to law. The Court remands this issue with the instruction that Commerce

recalculate COP for Minasligas based upon an accounting methodology which is non-distortive and

reasonably reflective of actual costs.

### C.    Commerce's Reliance on the Consolidated Financial Statements of Solvay & Cie

Plaintiffs argue that Commerce's reliance on the consolidated financial statements of Solvay

& Cie, the owner of respondent's immediate Brazilian parent corporation, in determining

respondent's interest expenses "does not accurately capture the financing costs associated with

production of the subject merchandise, [and is] contrary to the language and intent of the statute."

*Id.* at 33. In response, Commerce states that it is the Department's established practice to use the

consolidated financial statements of a respondent's parent corporation, rather than respondent's

financial statements, when the record establishes corporate control by the parent over respondent.

Def.'s Br. at 35-36.  Commerce, relying upon *Accounting Research Bulletin No. 51, Consolidated Financial Statements*, Committee on Accounting Procedure, American Institute of Certified Public Accountants (August, 1959) ("*Bulletin No. 51*"), argues that "majority equity ownership is *prima facie* evidence of control over the subsidiary . . . ."  *Id.* at 37.[5]  And once the *prima facie* case has been made, Commerce contends that the burden then shifts to the party challenging corporate control to demonstrate a lack of corporate control over respondent.  *Id.*

This Court finds, however, that *Bulletin No. 51* neither supports nor authorizes Commerce's creation of a bright line evidentiary standard.  *Bulletin No. 51* provides that "[t]he *usual condition* for a controlling financial interest is ownership of a majority voting interest, and, therefore, *as a general rule* ownership by one company, directly or indirectly, of over fifty per cent of the outstanding voting shares of another company *is a condition pointing toward* consolidation." *Bulletin No. 51, 51.02* (emphasis added).  *Bulletin No. 51* neither states nor implies that "in most circumstances, majority ownership is *prima facie* evidence of corporate control" as defendant alleges.  Def.'s Br. 35.  Rather, *Bulletin No. 51* holds that evidence of majority equity ownership, while arguably the most important factor to be considered, is still just one "condition pointing toward consolidation."  *Bulletin No. 51, 51.02*.  Commerce's reliance upon a *prima facie* evidentiary standard is, therefore, without merit and must be rejected.  The Court now considers whether there is substantial evidence upon the record to support Commerce's reliance upon the consolidated

---

[5]  The respondent at issue, CBCC, is 99.9 percent owned by Solvay do Brasil, which is in turn 100 percent owned by Solvay & Cie.  Based on this ownership arrangement, Commerce determined, for purposes of the Department's interest expense review, that Solvay & Cie was the parent corporation of respondent CBCC.

financial statements of Solvay & Cie.

Commerce notes that its practice of relying upon the consolidated financial statements of a parent corporation is based upon the fact that the controlling entity, "'because of its influential ownership interest, has the power to determine the capital structure of each member company within the group.'" Def.'s Br. at 35 (quoting *Final Determination of Sales at Less Than Fair Value: New Minivans From Japan*, 57 Fed. Reg. 21,937, 21,946 (1992)). If Commerce's primary concern is control by the parent corporation, then it seems to this Court that the immediate parent corporation, in this case Solvay do Brasil, would be much more likely to have and exercise direct control over the subsidiary. This Court's impression is supported by record evidence which confirms financial activity between Solvay do Brasil and CBCC. In contrast, "[t]here is no evidence on the record that Solvay & Cie and Solvay do Brasil engage in similar intercompany transactions and borrowing. . . . To the contrary, the record demonstrates that Solvay & Cie's financial statements are *not* reflective of the actual cost incurred by CBCC to produce and sell silicon metal." Pls.' Br. at 35 (emphasis original). The Court agrees with plaintiffs' observations and, therefore, remands the calculation of CBCC's financial expenses with the instruction that Commerce base those expenses upon the consolidated financial statements of CBCC and its immediate parent Solvay do Brasil.

### D.      Issues For Which Commerce Agrees Remand Is Appropriate

The Court additionally finds that remand is appropriate for all issues for which Commerce agrees to remand including: (1) recalculation of CBCC's depreciation expense; (2) correction of Rima's COP and CV; (3) recalculation of Eletrosilex's financial expenses; (4) recalculation of COP and CV to accurately reflect CBCC's and Rima's cost of internally-produced charcoal; (5)

recalculation of CBCC's COP and CV to include supervisory labor costs; (6) recalculation of CBCC's CV to include IPI taxes; (7) recalculation of CV profit for Rima and CBCC based upon profit ratios determined from non-CBCC financial statements; (8) reconsideration of Minasligas' interest income expense; and (9) recalculation of CV profit for Minasligas.

## IV.     Conclusion

Therefore, upon reading plaintiffs' and defendant-intervenors' motions for judgment upon the agency record, responses thereto, and upon due consideration of all other papers and proceedings had herein, the Court hereby remands the *Final Results* as to: (1) Minasligas' claimed depreciation; (2) CBCC's interest expenses; (3) CBCC's depreciation expenses; (4) Rima's deferred expenses; (5) Eletrosilex's financial expenses; (6) CBCC's and Rima's cost of internally-produced charcoal; (7) CBCC's supervisory labor costs; (8) CBCC's IPI taxes; (9) Rima's and CBCC's profit ratios; (10) Minasligas' interest income expense; and (11) Minasligas' profit calculation. The Court affirms the *Final Results* as to all other issues.

_____
R. KENTON MUSGRAVE
JUDGE

Dated:  April 9, 1999
         New York, New York