**Slip Op. 99-42**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                        :
THAI PINEAPPLE CANNING INDUSTRY         :
CORP., LTD., and MITSUBISHI             :
INTERNATIONAL CORP.,                    :    Court No. 98-03-00487
                                        :
        Plaintiffs,                     :    Public Version
                                        :
            v.                          :
                                        :
UNITED STATES,                          :
                                        :
        Defendant,                      :
                                        :
        and                             :
                                        :
MAUI PINEAPPLE CO., LTD., and           :
INTERNATIONAL LONGSHOREMEN'S AND        :
WAREHOUSEMEN'S UNION,                   :
                                        :
        Defendant-Intervenors.          :
_____:

[ITA determination remanded.]


                                Dated:  May 5, 1999


        Dickstein Shapiro Morin & Oshinsky LLP (Arthur J. Lafave,
III, Douglas N. Jacobson, and Patricia M. Steele) for plaintiffs.

        David W. Ogden, Acting Assistant Attorney General, David M.
Cohen, Director, Commercial Litigation Branch, Civil Division,
United States Department of Justice (Lucius B. Lau), Stacy J.
Ettinger, Office of the Chief Counsel for Import Administration,
United States Department of Commerce, of counsel, for defendant.

## OPINION

**RESTANI, Judge:** This motion is before the court on Plaintiffs' Motion for Judgment on the Administrative Record, pursuant to CIT Rule 56.2. Plaintiffs seek review of the final results of the first administrative review of the antidumping duty order on Canned Pineapple Fruit from Thailand, 63 Fed. Reg. 7,392, 7,392 (Dep't Commerce 1998) [hereinafter "Final Results"], covering sales to the United States during the period January 11, 1995, through June 30, 1996.

### Jurisdiction and Standard of Review

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). In reviewing final determinations in antidumping duty investigations, the court will hold unlawful those agency determinations which are unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

### Procedural History

On July 18, 1995, the United States Department of Commerce ("Department" or "Commerce") published an antidumping duty order on canned pineapple fruit ("CPF") from Thailand. Canned Pineapple Fruit from Thailand, 60 Fed. Reg. 36,775, 36,776 (Dep't Commerce 1995). On August 15, 1996, the Department published a

notice initiating an administrative review for sales during the period January 11, 1995, through June 30, 1996. <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews and Requests for Revocation</u>, 61 Fed. Reg. 42,416, 42,417 (Dep't Commerce 1996). Initial questionnaires were issued on September 5, 1996, to Thai Pineapple Canning Industry Corp., Ltd. ("TPC"), Princes Foods B.V. ("Princes") and Mitsubishi International Corp. ("MIC"). Princes is a TPC affiliate, located in the Netherlands, that resells canned pineapple fruit into the German market. Pl.'s Br. at 4. MIC is an affiliated reseller in the United States. <u>Id.</u> TPC reported third-country sales to Germany in its sales responses because the home market was not viable. <u>TPC Questionnaire Response</u> (Nov. 13, 1996), at 2-3, P.R. Doc. 35, Pl.'s App., Tab 3, at 2-3.

The Department initiated a below-cost sales investigation on January 13, 1997. <u>Canned Pineapple Fruit from Thailand</u>, 62 Fed. Reg. 42,487, 42,487 (Dep't Commerce 1997) (prelim. results and partial termination of antidumping duty admin. rev.) [hereinafter "<u>Preliminary Results</u>"]. TPC, Princes, and MIC participated in verifications conducted in May and June 1997 in Thailand, the Netherlands, and the United States, respectively. Pl.'s Br. at 5. Following verification, the Department issued the <u>Preliminary</u>

Results on August 7, 1997.  62 Fed. Reg. at 42,487.  The Department provided interested parties the opportunity to comment on its Preliminary Results.  See id.

After issuance of the Final Results on February 13, 1998, TPC filed a letter alleging a clerical error.  Letter to Commerce (Feb. 17, 1998), at 1, C.R. Doc. 95, Pl.'s App., Tab 7, at 1. TPC noted that, without comment, the Department calculated in the Final Results a single assessment rate for two separate importers, Mitsubishi Foods, Inc., ("MFI") and MIC, even though it had calculated separate rates for each of these companies in its Preliminary Results.  Id. at 1-2.  The Department issued a memorandum concluding that its calculation of a single assessment rate for these two companies was not a clerical error and was in accordance with its practice regarding affiliated importers. Memo from Commerce (March 5, 1998), at 2-3, P.R. Doc. 204, Pl.'s App., Tab 2, at 2-3.

At issue in this review are the propriety of the single weighted-average cost of production for the entire period of review ("POR"), the selection of date of sale for third-country sales, the calculation of profit for constructed export price ("CEP") purposes, the assessment rate on sales outside the cap period established by 19 U.S.C.A. § 1673f (West Supp. 1999), and

the related issue of the propriety of a single assessment rate

for MIC and its predecessor, MFI.  The final issue of the

assessment rate on entries made after the Final Results is

remanded per agreement of the parties, as neither plaintiffs nor

Commerce had an adequate opportunity to address this issue.

Facts regarding the remaining issues will be set forth in

connection with each issue separately.[1]

**I.   Use of a Single Weighted-Average Cost of Production
       Covering Entire 18-Month Period of Review**

       **A.  Facts**

As noted, the challenged administrative review results

involved CPF from Thailand which entered the United States during

the period January 11, 1995, through June 30, 1996.  Final

Results, 63 Fed. Reg. at 7,392.  As part of its antidumping

analysis, Commerce conducted a cost of production ("COP")

investigation of TPC's third-country sales.[2]  Id.  Because

certain CPF products produced by TPC failed the COP test as

applied by Commerce, Commerce used constructed value ("CV") as

---

[1]    Defendant-intervenors Maui Pineapple Co., Ltd., elected
not to file a response brief and did not otherwise participate in
the substantive aspects of this case.

[2]    Third country sales are sales of like merchandise in
other than the United States or the exporting country.  See 19
U.S.C. § 1677b(a)(1)(B)(ii) (1994).

the basis of normal value ("NV")[3] where (1) there were no contemporaneous sales of a comparable product or (2) all contemporaneous sales of a comparable product failed the COP test.  Gov't Br. at 14.  For both COP and CV, Commerce determined the cost of production of CPF using a single, weighted-average cost for the entire period of review.  Final Results, 63 Fed. Reg. at 7,399-7,400.

Given generally rising costs,[4] TPC computed a separate cost

---

[3]     If sufficient quantities of goods are sold in the country of production above the cost of production, normal value will be based on home country sales prices.  If home country sales are not usable, Commerce may use third country sales or CV, which is based on COP, as normal value.  See 19 U.S.C. § 1677b(a).

[4]     By plaintiff's calculations, fresh pineapple costs per carton of CPF, computed using the Department's net realizable value ("NRV") method, rose by [ ]% from 1994 to 1995 and by [ ]% from 1994 to 1996.  See Memo from Commerce (July 31, 1997), at Sch. 1, C.R. Doc. 86, Pl.'s App., Tab 9, at 2 ([ ] baht per standard carton in 1995 and [ ] in 1996); TPC Case Brief (Sept. 8, 1997), at Attachment 1, C.R. Doc. 87, Pl.'s App., Tab 10, at 9 ([ ] baht per standard carton in 1994).
Fresh pineapple costs account for about [ ]% of the finished product cost.  Plaintiff arrives at this calculation by dividing the Total Net Pineapple Cost to CPF of [ ] by total standard cases, [ ], to yield fruit costs of [ ] baht per carton and comparing this with total cost of manufacturing ("TOTCOM") for 1995 products ranging from [ ] baht per carton to [ ] baht per carton.  Memo from Commerce, at Sch.s 1 and 5(a), Pl.'s App., Tab 9, at 2-3.  In addition, interest expenses ("INTEX"), calculated according to the methodology used by the Department in its Preliminary and Final Results, amounted to [ ]% of cost of manufacturing ("COM") in 1995, but were [ ] in 1994.  TPC Case Brief, at 7, Pl.'s App., Tab 10, at 2.
Therefore, plaintiffs calculate that finished product costs

for each fiscal period covered by its sales responses -- 1994,

1995, and 1996 -- and submitted them in its cost responses with a

request that the Department use the separate fiscal period costs

for its determinations of COP and CV.  TPC Section D

Questionnaire Response (Feb. 18, 1997), at 27, C.R. Doc. 31,

Pl.'s App., Tab 11, at 2.  Notwithstanding TPC's request, the

Department calculated a single "average" COP and a single

"average" CV based on costs of production computed over the

period January 1, 1995, to June 30, 1996.  Final Results, 63 Fed.

Reg. at 7,399-7,400.  Plaintiffs allege that the calculation of a

single, weighted-average cost over this period, and the use of

that cost for comparison to sales prices early in the period,

resulted in significant distortions in the Department's price-

cost comparisons, including distortions in its determination of

which sales should be disregarded as below cost and in the

Department's determination of CV.  Id. at 7,399.  Plaintiffs

allege in particular that distortion occurred because the

Department did not match up 1995 sales with the low 1994 costs

---

rose by [  ]% from 1994 to 1995 and by [  ]% from 1994 to the first
half of 1996.  Pl.'s Br. at 8 (computed by multiplying the
increase in fresh fruit cost by [  ] to derive the increase in COM
and adding [  ]% for increased interest expenses).

related thereto.[5]  Id.

Commerce contends that costs did not rise in a continuous manner over that entire POR and that a period-wide weighted-average was approved in Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1038-39 (Fed. Cir. 1996).

**B. Discussion**

It is apparent to the court that Commerce has read too much into Fujitsu, which is readily distinguishable.  First, Fujitsu approved costs constructed on an annual basis.  Id. at 1039 ("decision to sustain Commerce's use of annual weighted-average COP in calculating FMV . . . correct.") (emphasis added).  This is basically all plaintiffs seek here.  They want costs for a

---

[5]      Because there is a 30-40 day transit time from Thailand to the United States, TPC Case Brief, at 40, Pl.'s App., Tab 10, at 8) and merchandise is typically held in inventory in the United States for [ ] months prior to sale to the first unaffiliated customer, most of the merchandise in CEP comparison sales made by TPC's affiliate MFI in the first few months of the POR appear to have been manufactured in 1994.  See id. at 9, Pl.'s App., Tab 10, at 4; TPC Questionnaire Response (Nov. 12, 1996), at Ex. 56, C.R. Doc. 5, Pl.'s App., Tab 12, at 4 (showing number of days of approximately [ ] months); TPC Verification Ex. No. LA-18, at 1, C.R. Doc. LA-18, Pl.'s App., Tab 14, at 1 (showing number of days of approximately [ ] months).  TPC brought this fact to the Department's attention in its initial responses, reported the year of manufacture in its response, and suggested that the Department calculate a separate fiscal period COP and CV for 1994 production.  Final Results, 63 Fed. Reg. at 7,399.

fiscal year matched to sales for a fiscal year.[6]  In Fujitsu,
respondents sought monthly or quarterly averaging.  Id. at 1036.

Second, almost all of the factors which the appellate court
found were missing in Fujitsu are present here.  Fujitsu involved
multi-input television receivers, id., not a one primary-input
product, such as canned pineapple from raw pineapple.  In such a
case, Commerce must be particularly sensitive to changes in the
price of the raw commodity.  See e.g. Brass Sheet and Strip From
the Netherlands, 53 Fed. Reg. 23,431, 23,432-33 (Dep't Commerce
1988) (final LTFV determ.) (POR split to account for metal price
rise).[7]  Next, the Fujitsu court noted no significant cost rise
from the beginning to the end of the POR.  Fujitsu, 88 F.3d at
1039.  Here, a cost rise of almost 50% occurred over eighteen
months, notwithstanding the fact that there was a tremendous cost
rise mid-review which moderated somewhat by June 1996.  See Pl.'s
Br. at Tab C (reflecting monthly fresh pineapple costs from

---

[6]     Because the POR does not match up with TPC's fiscal
year, this might necessitate a 6-month averaging period, but this
does not seem greatly burdensome.

[7]     Defendant is incorrect that this was necessitated by
the difference in merchandise provision because similar, not
identical, merchandise was used for comparison.  The Brass Sheet
respondents requested a circumstances of sales adjustment to
account for a 70% metals price rise.  This was denied, and
separate foreign market values were computed for four-month
periods.  Comparison U.S. sales were matched to the periods.  See
Brass Sheet 54 Fed. Reg. at 23,432-433.

January 1995 to June 1996).

In the past, the Department has adjusted for changes in costs over the POR or matched costs to POR sales more specifically than it did here. The court notes a few particularly telling examples. In <u>Certain Cold-Rolled Carbon Steel Flat Products from Germany</u>, for example, the Department relied upon separate fiscal year costs and allocated expense data for sales observations according to the year in which the sales took place. 60 Fed. Reg. 65,264, 65,270 (Dep't Commerce 1995) (final results of antidumping duty admin. rev.).[8]

Commerce admits that there is a basic principle that Commerce will utilize shorter cost reporting periods if markets experience significant and consistent price declines. <u>See</u>, <u>e.g.</u>, <u>Static Random Access Memory Semiconductors from Taiwan</u>, 63 Fed. Reg. 8,909, 8,920 (Dep't Commerce 1998)(final LTFV determ.). Commerce has not explained why significant price rises are not worthy of such an adjustment.[9]

---

[8]    Defendant is incorrect that this was done only for the general expenses calculation. It is apparent from the discussion that separate fiscal year costs and expenses were used for all elements of constructed value because the respondent reported them that way. <u>See</u> <u>Certain Cold-Rolled Carbon Steel Flat Products from Germany</u>, 60 Fed. Reg. at 65,270.

[9]    Moreover, in the preliminary determination in <u>Static Random Access</u>, the Department stated that it would generally "compare sales and conduct the sales below cost test using annual

Finally, the Department cannot explain away the following cases. In Sweaters Wholly or in Chief Weight of Man-Made Fiber from Taiwan, the Department did not use annual average unit costs where there was a significant variation between what was produced during the POR and what was sold during the POR. 55 Fed. Reg. 34,585, 34,596 (Dep't Commerce 1990) (final LTFV determ.) [hereinafter "Sweaters"]. Instead the Department used the costs of the individual production runs (whether or not falling within the POR) in which the subject merchandise was actually produced. Id. In Fresh and Chilled Atlantic Salmon from Norway, the Department found that a single average cost of cultivation (COC) should not be calculated for the POR, stating:

> [B]ecause no 1990-generation salmon were harvested until 1991, averaging the COC for 1990-generation salmon with the 1989-generation salmon could lead to distortions in determining whether 1990-third country sales were made at prices below cost. Moreover, given the fluctuations of farmers' costs during the POR, the ease with which different generations' COC can be segregated, and the fact that we have calculated separate 1990 and 1991 processing costs for respondent Skaarfish, we believe it is reasonable to use separate

averages. However, where prices have moved significantly over the course of the POI, it has been the Department's practice to use shorter time periods." Static Random Access Memory Semiconductors from Taiwan, 62 Fed. Reg. 51,442, 51,444 (Dep't Commere 1997) (prelim. determination of sales at LTFV) (emphasis added). This statement further shows there is no reason to limit the use of shorter cost reporting periods to instances when the market experiences price declines and not when it experiences price increases.

1990 and 1991 COCs.

58 Fed. Reg. 37,912, 37,913 (Dep't Commerce 1993) (final results
of antidumping duty admin. review) (emphasis added).

It is insufficient to cast away previous decisions on the
basis that the extent of the distortion was not noted.  This
cannot be a way to insulate inconsistent decisions from review.
While it is certainly true that the need to use monthly averages
generally may be restricted to cases of hyper inflation, see
Asociacion Colombiana de Exportadores de Flores v. United States,
6 F. Supp.2d 865, 873-74 n.7 (Ct. Int'l Trade 1998), even
Commerce recognizes that there is a middle range choice of six
months to one year averaging.  There is also the possibility of
matching costs more closely with sales, as various administrative
determinations indicate.

Given the distortions in calculating COP and CV caused by
inattention to the price rise for a single primary input product,
and the lag between goods produced (in a one-day canning process)
but not sold until months later, Commerce must revisit this
issue.

Commerce must reanalyze the data to determine whether TPC
has provided sufficient data to match costs to appropriate fiscal
year sales.  If it has, in the absence of any proper antidumping

policy reason[10] for not doing this seemingly minimally burdensome and substantially less distortive comparison, Commerce must proceed as it has in the past and match fiscal year costs with sales.

**II.  Use of Date of Contract for Date of Third Country Sale**

**A.   Facts**

In its antidumping analysis, Commerce identifies a "date of sale" for merchandise sold to the United States, the exporting country, and third countries.  In the Final Results, Commerce recognized the existence of two dates associated with TPC's export price ("EP") and third-country sales:  the earlier date of contract and the later date of invoice.  See 63 Fed. Reg. at 7,394.  Commerce examined these dates and found that all but five of the third country sales[11] had identical terms in both the contracts and the invoices.  Id.  Thus, Commerce determined that the date of contract was the proper date of sale because the contract, not the invoice, established the material terms of

_____

[10]   Commerce's answer that respondents would only provide pre-POR cost data when it suited them does not appear to be a sufficient reason.  Commerce can ask for relevant cost data if costs are either declining or rising significantly and it has not been stopped by such a concern in the past.  See, e.g., Sweaters, 55 Fed. Reg. at 34,596.

[11]   Five of [ ] third country sales had contract changes. Gov't's Br. at 27.  One of several hundred EP sales had changes. Final Results, 63 Fed. Reg. at 7,394.

sale.  Id.

**B.  Discussion**

The first question to ask is what principle should guide Commerce in choosing the date of sale.  It appears undisputed that in the past, in general, Commerce has looked to the date by which the essential terms of sale are fixed in order to determine date of sale.  See Al Tech Specialty Steel Corp. v. United States, No. 97-08-01328, 1998 WL 661461, at *2 (Ct. Int'l Trade 1998) (citing cases).  This seems reasonable if one is trying to compare sales in two markets or costs and sales.

There is no new statutory guidance on this point except for the general statement that NV shall be the price "at a time reasonably corresponding to the time of the sale used to determine the export price or constructed export price."  19 U.S.C. § 1677b(a)(1)(A).  There was no regulation on point applicable to the investigation at issue.

On March 29, 1996, Commerce stated in an internal memorandum that it had published proposed regulations which provide that the agency would normally establish the date of invoice as the date of sale.  Pl.'s Br. at Tab D.  Commerce further stated that it was implementing this change immediately in all reviews initiated after April 1, 1996.  Id.  The administrative review at issue

here was initiated on August 15, 1996.  Initiation of Antidumping

Duty and Countervailing Duty Admin. Reviews, 61 Fed. Reg. at

42,417.  The proposed regulations referenced by Commerce in its

March 29, 1996, memorandum were ultimately issued as final

regulations on May 19, 1997.  See Antidumping Duties;

Countervailing Duties, 62 Fed. Reg. 27,296, 27,296 (Dep't Comm.

1997) ("Final Regulations").  The Final Regulations, however,

only apply to reviews requested on or after July 1, 1997.  See 19

C.F.R. § 351.701 (1998).  With regard to reviews conducted

pursuant to the Uruguay Round Agreements Act ("URAA"), Pub. L.

No. 103-465, 108 Stat. 4809 (1994), but not formally subject to

the Final Regulations, Commerce stated, "[P]art 351 will serve as

a restatement of the Department's interpretation of the

requirements of the Act as amended by the URAA."  Id.  In this

case, Commerce did not refer to the regulations as controlling,

but, rather, discussed the regulations as reflecting Commerce's

current practice with respect to date of sale.  Final Results, 63

Fed. Reg. at 7,394 n.2.

     Notwithstanding its new policy preference to utilize the

date of invoice as the default date of sale, Commerce determined

that the date of contract for TPC's EP and third-country sales

should determine the date of sale.  Id. at 7,394.  In the Final

Results, Commerce stated that its new preference for the date of invoice would apply "'absent satisfactory evidence that the terms of sale were finally established on a different date.'"  Id. (quoting the Final Regulations, 62 Fed. Reg. at 27,349).  With regard to TPC, Commerce stated that it found sufficient evidence that the terms of sale were established on a different date.  As noted by Commerce, "[t]he evidence on the record indicates that there were changes to the contracted terms of TPC's POR sales for only one out of several hundred EP sales, and five out of several hundred third country sales."  Id.  For this reason, Commerce determined that the date of contract should act as the date of sale because all material terms of sale were established at the time of contracting.  Id.

Accepting this as a statement of policy that applied to this proceeding, it appears that the number of changes noted may not be particularly probative of whether or not this is an industry in which renegotiation is common, or whether the terms of the sales were firmly set on the contract date.  Thus, why this was accepted as evidence warranting departure from the general invoice date policy is not clear.

How the new policy is being applied remains something of a mystery.  Plaintiffs offer three examples of administrative

decisions that at least cause some concern that Commerce acted
inconsistently in this case.  See Small Diameter Circular
Seamless Carbon and Alloy Steel Standard, Line and Pressure Pipe
From Germany, 63 Fed. Reg. 13,217, 13,226 (Dep't Commerce 1998)
(final results of antidumping admin. review) (use of shipment
date for date of sale when invoice date after shipment; sales
terms not fixed until date of shipment; decision references post-
contract changes, but the amount is not specified); Open-End Spun
Rayon Singles Yarn from Austria, 62 Fed. Reg. 14,399, 14,399-400
(Dep't Commerce 1997) (prelim. LTFV determ.) (invoice date used
for short term contracts where little lag time between the date
of shipment and date of invoice; no discussion of use of sales
contract date); Certain Stainless Steel Wire Rod from India, 62
Fed. Reg. 38,976, 38,979 (Dep't Commerce 1997) (final results of
antidumping admin. review) (invoice date used because no long
term contracts and short period between purchase orders and
invoice); see also Koenig & Bauer-Albert AG v. United States, 15
F. Supp.2d 834, 843 n.3 (Ct. Int'l Trade 1998) (date of sale
established upon invoice and shipment to allocate indirect
selling expenses to POR U.S. sales; substantial gap between sale
and shipment).

     Neither in the Final Results, nor in its arguments to the

court, has Commerce offered evidence that long term contracts or long lag time between contract and shipment or invoice was a concern in this case.  If there is another reason for rejecting invoice date which Commerce did not have reason to state in the cases cited, it should state that reason.  Commerce must reconsider this issue and square its reasoning with its other contemporaneous determinations.

**III. Calculation of CEP Profit**

    **A.    Facts**

Under 19 U.S.C. § 1677a(c) and (d) (1994), CEP is adjusted for various items which are expected to be found in the sales price.[12]  One of the reductions to price for purposes of arriving at CEP is profit.  19 U.S.C. § 1677a(d)(3).

Profit is calculated according to 19 U.S.C. § 1677a(f) (1994), which reads:

---

[12]  CEP is a constructed United States price which is compared to NV to determine if the merchandise at issue is being sold at less than fair value in the United States.  CEP is intended to be an approximation of ex factory price, and it is used in place of export price when affiliated U.S. sellers, rather than the exporters, make the U.S. sales.  See 19 U.S.C. § 1677a(b) (1994).

**(f) Special rule for determining profit**

### (1) In general

For purposes of subsection (d)(3) of this section, profit shall be an amount determined by multiplying the total actual profit by the applicable percentage.

### (2) Definitions

For purposes of this subsection:

#### (A) Applicable percentage

The term "applicable percentage" means the percentage determined by dividing the total United States expenses by the total expenses.

#### (B) Total United States expenses

The term "total United States expenses" means the total expenses described in subsection (d)(1) and (2) of this section.

#### (C) Total expenses

The term "total expenses" means all expenses in the first of the following categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise:

(i) The expenses incurred with

respect to the subject merchandise sold in the United States and the foreign like product sold in the exporting country if such expenses were requested by the administering authority for the purpose of establishing normal value and constructed export price.

(ii) The expenses incurred with respect to the narrowest category of merchandise sold in the United States and the exporting country which includes the subject merchandise.

(iii) The expenses incurred with respect to the narrowest category of merchandise sold in all countries which includes the subject merchandise.

**(D) Total actual profit**

The term "total actual profit" means the total profit earned by the foreign producer, exporter, and affiliated parties described in subparagraph (C) with respect to the sale of the same merchandise for which total expenses are determined under such subparagraph.

Id.

For its Final Results, the Department calculated CEP profit by computing the ratio of total profit to total expenses and multiplying that ratio, on a transaction-by-transaction basis, by reported U.S. selling expenses. Final Results, 63 Fed. Reg. at 7,395. The statute dictates a different approach. The statute

calls for multiplication of total profit by the ratio of total United States expenses to total expenses.  See 19 U.S.C. §§ 1677a(f)(1)-(2)(A).  Theoretically, the two computations should yield the same result:  A * B/C = A/C * B.  The Department apparently adopted its method because total profit is generally not computed on a per-unit basis, but is calculated in gross. Therefore, the Department divides the total profit in gross by the total expenses in gross and multiplies by unit U.S. selling expense for an individual sale to obtain a unit profit.

The statute's drafters intended that profit would be allocated to U.S. sales in the same ratio as United States selling expenses are to total expenses (i.e., that the portion of total profit on a sale attributable to activities conducted in the United States is equal to the ratio of the cost of those activities to the cost of all activities generating the sales revenue).  As explained in the Statement of Administrative Action ("SAA"),[13] the profit to be deducted from the CEP is the profit "allocable to the selling, distribution, and further

---

[13]    The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round Agreements . . . The Administration understands that it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this statement."  SAA, at 1.

manufacturing expenses in the United States."  SAA accompanying
the URAA, H.R. 103-5110, H.R. Doc. No. 316, Vol. 1, 103d Cong. 2d
Sess. (1994), at 823, reprinted in 1994 U.S.C.C.A.N. 3773, 4163.
"The profit to be deducted from the starting price in the U.S.
market is that proportion of total profit equal to the proportion
which U.S. manufacturing and selling expenses constitute of total
manufacturing and selling expense."  SAA, at 824.

The Department does include U.S. imputed expenses in the
numerator of the applicable percentage or ratio but not in the
denominator.  See Final Results, 63 Fed. Reg. at 7,394.  The
Department also excludes imputed expenses from the total actual
profit figure required by 19 U.S.C. § 1677a(f)(2)(D), which
perforce represents total expenses deducted from total revenue.
It then uses the total expense figure for purposes of the
statutory ratio.  Commerce is not following the statutory formula
precisely.  It is focusing on creating symmetry in the ratio it
constructs, i.e., total profit to total expenses, as opposed to
the ratio established by the statute, total U.S. expenses to
total expenses.  The question before the court, therefore, is
whether this is permissible.

Both parties' briefs failed to cite the court's decision
which is most on point, U.S. Steel Group v. United States, 15 F.

COURT NO. 98-03-00487                                                            PAGE 23

Supp.2d 892, 896-98 (Ct. Int'l Trade 1998).[14]

**B.   Discussion**

In U.S. Steel, the court ruled that, under 19 U.S.C. § 1677a(f), the statutory ratio applied to "actual profit" for purposes of calculating CEP profit must be calculated on a proportional basis.  15 F. Supp.2d at 896-98.  The court left undecided whether the "actual" profit calculation under 19 U.S.C. § 1677a(f)(2)(D) must include categories of expenses present in the ratio.  See id. at 898 n.6.  The court indicated that defendant had presented no argument that this was so.  Id.

In this action, defendant has attempted an explanation of why actual profit should not contain "imputed expenses" based on the use of the word "actual" in 19 U.S.C. § 1677a(f)(2)(D), but not elsewhere in the provision.  This is facially a plausible reason for the omission.  Commerce's argument misses the mark, however, where it indicates that the statute and the SAA require that total expenses in the statutory ratio applied to actual profit must be exclusive of imputed expenses just because some form of total expenses is also used in the actual profit

_____

    [14]  This is a particularly egregious error on the part of the Government, as the case is adverse to its position.  Upon discovering the case during preparations for oral argument, counsel should have advised opposing counsel and the court. Failure to do so impeded oral argument.

calculation.

First, in the total actual profit provision, 19 U.S.C. § 1677a(f)(2)(D), the term "total expenses" is used simply to indicate the pool of sales from which to calculate actual profit. Second, the SAA makes clear that the pool of sales involved is the same for both total expenses in the ratio and total actual expenses in the total actual profit calculation. SAA, at 824-25. Third, the three alternatives for selection of a sales pool for calculation of expenses found at 19 U.S.C. § 1677a(f)(2)(C) do not relate directly to the selection of the categories of expenses to be used in the ratio. As with subsection 1677a(f)(2)(D), it is the choice of the sales pool which is specified, not categories of expenses.

Commerce has some flexibility in determining total U.S. expenses under 19 U.S.C. §§ 1677a(d)(1)-(2), the figure which is used in the ratio calculation, pursuant to 19 U.S.C. § 1677a(f)(2)(B). But if Commerce decides to include a category of expenses in calculating total U.S. expenses in the numerator, it must also include such expenses in the denominator of the ratio, unless they are already represented in total expenses in some other fashion. See U.S. Steel, 15 F. Supp.2d at 898. The statutorily defined denominator represents a figure containing

both total U.S. expenses and the expenses attributable to the
foreign like product sold in the home market.  See 19 U.S.C.
§ 1677a(f)(2)(C)(i).  Commerce cannot arbitrarily remove part of
the total U.S. expenses from the statutory ratio.

The court concludes that there is some ambiguity in the use
of the word "actual" in § 1677a(f)(2)(D).  It may not be an
unreasonable interpretation to conclude that imputed expenses
should be excluded in the actual profit calculation, if that
construction can be squared with the necessity of a properly
calculated statutory ratio.  It is a proper ratio that ensures
proper allocation of profit to U.S. sales.  If the profit
allocable to CEP is somewhat lower because U.S. expenses are made
higher by the addition of imputed expenses, this would not seem
to be antithetical to the statute.  There is also nothing that
categorically prevents the inclusion of imputed expenses.
Rather, imputed expenses should be omitted from actual profit if
they duplicate expenses already accounted for.  Their inclusion
is not per se incompatible with the use of the word "actual."
The question is whether the imputed expenses represent some real,
previously unaccounted for, expense.

Commerce may not ignore the statutory language just because,
for administrative reasons, it has chosen a different starting

point for its profit calculation.  Of course, it may continue to use a different form of calculation if the result comports with the statute.  What Commerce must do in this case is to start with the statutory scheme.  If its method of calculating U.S. expenses is not compatible with the new CEP statute, it must amend that approach.  It cannot ignore that "total expenses" in the denominator includes both U.S. expenses and expenses allocable to the foreign sold product.  See 19 U.S.C. § 1677a(f)(2)(C).  Of course, if the imputed expenses are simply a part of an expense which was allocated to U.S. sales, and that portion is fully retained as to the foreign sales as a part of "total expenses," it is perforce included in the denominator of the ratio.  If this is so, Commerce needs to support this with citations to the record.[15]  Commerce has not established that the expenses at issue are already in the denominator and thus, has not distinguished U.S. Steel.  This issue is remanded for calculation in accordance with this opinion.

---

[15]  Commerce provides no record appendix with its brief, nor did it cite to portions of the appendix provided by plaintiff.

**IV.  Use of a Single Assessment Rate**

   **A.   Facts**

   If Commerce makes a final affirmative dumping determination
and the International Trade Commission ("ITC") makes a final
affirmative injury determination, the statute requires that
Commerce publish an antidumping order which directs Customs to
"assess an antidumping duty equal to the amount by which the
normal value of the merchandise exceeds the export price (or the
constructed export price) of the merchandise" and to collect cash
deposits for estimated antidumping duties pending liquidation of
entries.  See 19 U.S.C. § 1673e(a)(1),(3) (1994).  If an
administrative review is subsequently requested, the statute
provides that Commerce will "review, and determine (in accordance
with paragraph (2)), the amount of any antidumping duty."  19
U.S.C. § 1675(a)(1)(B) (1994).  "[P]aragraph (2)" provides that
Commerce shall determine "the normal value and export price (or
constructed export price) of each entry of the subject
merchandise" and "the dumping margin for each such entry."  19
U.S.C. § 1675(a)(2)(A) (emphasis added).

   The statute also contains a provision entitled "Deposit of
estimated antidumping duty under section 1673b(d)(1)(B) of this
title," which provides as follows:

> If the amount of a cash deposit, or the amount of any bond or other security, required as security for an estimated antidumping duty under section 1673b(d)(1)(B) of this title is different from the amount of the antidumping duty determined under an antidumping duty order published under section 1673e of this title, then the difference <u>for entries of merchandise</u> entered, or withdrawn from warehouse, for consumption before notice of the affirmative determination of the Commission [ITC] under section 1673d(b) of this title is published shall be —
>
> > (1) disregarded, to the extent that the cash deposit, bond, or other security is lower than the duty under the order, or
> >
> > (2) refunded or released, to the extent that the cash deposit, bond, or other security is higher than the duty under the order.

19 U.S.C.A. § 1673f(a) (West Supp. 1999) (emphasis added).

Plaintiff argues that the statutes, read together, require Commerce to compute two assessment rates, one for the "cap period" (the period from Commerce's preliminary determination through the publication of the ITC's affirmative final determination) and one for the period after publication of the ITC's affirmative injury determination.

**B.    Discussion**

The court simply does not agree with plaintiffs' argument. 19 U.S.C.A. § 1673f(a) is a limitation on collection. It does not depend on the basic direction for deriving margins set forth in 19 U.S.C. § 1675(a)(2)(A).

In this case, plaintiff is disturbed because high margins relating to sales of merchandise entered during the cap period are part of the final average margin. It categorizes this as importing cap period duties to post-cap entries. Putting aside the usual problem, which may or may not exist in this case, of matching sales and entries, Congress did not provide that dumping margins during the cap period in excess of the anticipated amount of dumping (i.e., amounts in excess of the preliminary finding of dumping) should be disregarded in their entirety. Rather, Congress provided that Commerce should disregard amounts in excess of the preliminary finding of dumping "for entries of merchandise" made during the cap period. See 19 U.S.C.A. § 1673f(a). Congress has also provided that the agency shall determine the dumping margin for "each such entry" during the period of review. 19 U.S.C. § 1675(a)(2)(A)(ii). The Final Results have complied with both of these provisions by determining dumping margins for each entry during the period of review but capping the assessed duties during the cap period at the amount of estimated antidumping duties.

Previously, this Court has held that Commerce's decision to determine the dumping margin by use of all sales during the period (even sales which occur during the cap period) "will not

necessarily result in the violation of the statutory duty cap applicable to entries made between the preliminary less than fair value determination and the publication of the ITC's injury determination."  Ad Hoc Comm. of S. California Producers Of Gray Portland Cement v. United States, 19 C.I.T. 1398, 1407-08, 914 F. Supp. 535, 545 (1995).  In Ad Hoc, the plaintiff argued that the agency's decision to utilize all sales during the review period to determine the dumping margin violated 19 U.S.C. § 1673f(a). Id. at 1405, 914 F. Supp. at 543.  The Court, however, saw no violation because the agency indicated "that it will instruct Customs to liquidate the relevant entries at a rate no higher than the cap, in accordance with 19 U.S.C. § 1673f(a) (1988)."[16] Id. at 1408, 914 F. Supp. at 545.

Commerce explained in the Final Results that the adoption of separate assessment rates "would raise concerns about possible manipulation of data to avoid AD duties and unrestrained dumping of certain merchandise subject to an order."  Final Results, 63 Fed. Reg. at 7,394.  Furthermore, the cash deposits on entries during the cap and post-cap periods are simply estimates of

---

[16]     The only change made to 19 U.S.C. § 1673f(a), by amendment in 1996, was the replacement of the words "cash deposit" for "cash deposit, bond, or other security."  Compare 19 U.S.C. § 1673f(a) (1988) with 19 U.S.C.A. § 1673f(a) (West Supp. 1999).

dumping liability.  The actual assessment of antidumping duties is calculated in an administrative review under 19 U.S.C. § 1675(a) after Commerce reviews actual sales data for the period in question.  Under 19 U.S.C. § 1675(a), there is no prohibition against reviewing actual sales data on entries made during the cap period.

As held in Ad Hoc, 19 CIT at 1408, 914 F. Supp. at 545, Commerce's determination to use one assessment rate and to instruct Customs to cap the assessment comports with the statute. Because the court finds no effort to segregate cap and post-cap entries is necessary, the issue of whether MFI and MIC, basically the pre- and post-cap period affiliates, should receive separate assessment rates is mooted.

### Conclusion

This matter is remanded for Commerce to reconsider the following issues: 1) the assessment rate for entries made after the Final Results, 2) the matching of costs to sales on a fiscal year basis, 3) the date of sale, and 4) the CEP profit

calculation.  Remand results are due within 60 days.  Objections thereto are due 20 days thereafter and responses 11 days thereafter.


_____
Jane A. Restani
JUDGE


Dated:  New York, New York

This 5th day of May, 1999.